# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edward J. Schock,         :
            Appellant     :
                          :   No. 40 C.D. 2017
       v.                     :   Argued: June 5, 2017
                          :
City of Lebanon          :


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
              HONORABLE ANNE E. COVEY, Judge (P.)
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION**
**BY JUDGE SIMPSON**           **FILED: August 4, 2017**


In this appeal we are asked whose objections count toward determining whether a 40% statutory veto threshold has been reached under Section 5 of the Neighborhood Improvement District Act (the Act).[1]


In particular, Edward J. Schock (Objector) appeals from an order of the Court of Common Pleas of Lebanon County (trial court)[2] that granted the City of Lebanon's (City) motion for summary judgment and dismissed Objector's declaratory judgment action. Objector sought a determination that the 40% objection threshold for a veto of the City's final plan for a neighborhood improvement district (NID) was reached based on the fact that 132 of the 280 assessed properties formally registered their objections to the final plan. Objector asks whether, in interpreting Section 5(f)(2) of the Act, the term "affected property

---

[1] Act of December 20, 2000, P.L. 949, as amended, 73 P.S. §835.

[2] The Honorable Bradford H. Charles presided.

owners" should be construed to include the smaller group of only those property owners <u>assessed</u> under the proposed NID, or whether the term should include the larger set of all property owners located within the physical boundaries of the NID who will be <u>affected by</u> it. The trial court held that the term "<u>affected property owners</u>" in Section 5(f)(2) of the Act included the larger set of all property owners within the physical boundaries of the NID who will be <u>affected by</u> it. Upon review, we affirm.

## I. Background
## A. Passage of Lebanon BID

The trial court noted the following facts. In 2010, the City of Lebanon began contemplating a business improvement district (BID), a type of NID, for its downtown. A feasibility study recommended the appointment of a BID steering committee and the hiring of a consultant to develop a BID plan. In 2014, following a study including interviews with residents and business owners, the City published a 69-page economic development action plan designed to promote growth through 2020. The plan outlined the City's current status and the challenges it faced. The plan also set forth numerous proposals for meeting those challenges. In addition, the BID steering committee continued to develop plans for a BID.

In September 2015, the City sent a letter to all property owners and lessees located in the proposed BID. All recipients were invited to a public meeting on November 4, 2015. A court reporter attended the meeting and

2

transcribed the proceedings. Many residents provided comments both for and against the proposed BID.

A November 20, 2015 letter to all BID residents announced City Council's acceptance of the preliminary plan for the BID. The letter advised that the preliminary plan is now considered the BID final plan. The letter further communicated how BID residents could vote upon the establishment of the BID. Nothing needed to be done to register a "yes" vote.

However, to register a "no" vote, those opposing the creation of the BID had to submit written objections to the final plan to the City Clerk within 45 days. All objections would have to include the property address, the Lebanon County Tax Assessment Identification Number, and a notarized signature of all owners listed on the deed to the property. The letter also stressed that a negative vote of 40% of property owners would be needed to defeat the final plan for the BID.

Appendix B of the final BID plan included a list of 358 properties located in the BID. Of that number, 78 properties were deemed exempt from BID assessment. Both parties agreed that the City received 146 objections from property owners subject to assessment under the plan. However, the City rejected 13 of the objections, thereby counting only 132 objections.[3] Only one assessment-exempt property owner filed an objection; he also owned three assessed properties.

---

[3] The City counted 133 objections; however, one objection was from a non-assessed property owner.

In evaluating the 40% threshold for a veto of the final plan, the City considered not just the 280 properties subject to assessment, but also the 78 exempt properties. Therefore, the City determined that 132 of the 358 total <u>affected</u> properties objected. As the City interpreted Section 5(f)(2) of the Act, only 36.8% of the total 358 affected property owners objected. Thus, the 40% veto threshold was not reached.

### B. Objector's Declaratory Judgment Action

Nevertheless, in March 2016, Objector, owner of a property that would be annually assessed $250 for five consecutive years under the BID, filed a complaint for declaratory judgment seeking to declare the final plan vetoed or "dead." In his complaint, Objector asserted that the only list required in Section 5(c)(2)(iii) of the Act (pertaining to contents of preliminary plan) is "[a] list of all properties to be assessed." 73 P.S. §§835(c)(2)(iii). Objector argued the Act did not require a list of non-assessed properties within the BID boundaries. Consequently, Objector argues the 280 assessed properties in the BID are the only properties eligible to object to the final plan for the BID.

### C. City's Preliminary Objections (Demurrer)

Thereafter, the City filed preliminary objections in the nature of a demurrer challenging the legal sufficiency of Objector's declaratory judgment complaint. The City asserted the language in the Act established that all <u>affected property owners</u>, not just those <u>assessed</u>, have a say in whether the BID will pass.

4

After oral argument, the trial court entered an order overruling the City's preliminary objections without prejudice. Primarily, the trial court determined the issue of whether non-assessed properties can be considered affected property owners under the Act for purposes of vetoing the BID final plan was not ripe for disposition. As such, the trial court permitted the parties to close the pleadings and conduct discovery.

### D. Cross-Motions for Summary Judgment

Following the close of discovery, the City filed a motion for summary judgment. Essentially, the City argued that the term "affected property owners" in Section 5(f)(2) of the Act (pertaining to veto of final plan for NID) should include the exempt properties in the BID, which included church-owned properties and properties owned by educational and nonprofit healthcare providers. The City argued the evidence of record established that the term "affected property owners" in Section 5(f)(2) included both assessed and non-assessed property owners. Therefore, the City properly tallied the vote and adopted the BID final plan by resolution.

Conversely, Objector filed a cross-motion for summary judgment asserting that only assessed property owners are affected property owners for purposes of vetoing the final plan under Section 5(f)(2) of the Act. Objector advanced several arguments in support of his position. To begin, he cited the definition of "rational nexus" in Section 3 of the Act:

> The legal principle which requires that there is a <u>rational, definable benefit which accrues to any property owner assessed a fee for said benefit in an [NID]</u> created under

5

> this act.  All property owners within a designated [NID] paying a special assessment fee must benefit directly or indirectly from facilities or services provided by a [NID] management association within the [NID], provided, however, that property owners need not benefit equally.

73 P.S. §833 (emphasis added).

Further, Objector pointed out, there is no provision in the Act indicating that non-assessed property owners in an NID must benefit from the NID management association's (NIDMA) facilities or services.

Here, the BID makes all commercial and residential investment properties liable for paying a special assessment as a legally enforceable obligation.  Because all of the 280 assessed properties in the BID must pay and must benefit under the Act, Objector argued there are no free riders among the assessed property owners.  Therefore, if the 78 exempt properties are considered "benefited," they are all free riders to the extent they do not pay for the benefits received.

In other words, Objector asserted, the term "benefited properties" referred to properties subject to the special assessment by the BID.  Longstanding Pennsylvania case law makes it clear that special assessments can be justified only by benefits received by the properties subject to the assessments.  See Hammet v. Phila., 65 Pa. 146 (Pa. 1869); S.O.L. Club v. City of Williamsport, 443 A.2d 410 (Pa. Cmwlth. 1982); Pace Motels, Inc. v. Twp. of Loyalsock, 409 A.2d 459 (Pa. Cmwlth. 1979).  Further, Objector noted, the legislature, in enacting a statute, is presumed to be familiar with the judicial decisions construing it.  Petition to

6

Establish an Indep. Sch. Dist. for Prop. Situate in Jefferson Twp., 74 A.3d 389 (Pa. Cmwlth. 2013).

Objector further argued that the language in Section 5(b)(3) of the Act (titled "Specific procedures"), referencing "objections" of "<u>benefited</u> properties with the NID" (emphasis added), and the language in 5(f)(2) relating to the registered "disapproval" of the "final plan" by "40% or more of the <u>affected</u> properties owners within the proposed NID" (emphasis added), must be considered *in pari materia* under 1 Pa. C.S. §1932 and be considered together, if possible.

Therefore, Section 5(b)(3), relating to objections by 40% of the "benefited properties" and Section 5(f)(2), relating to 40% or more of "affected property owners" both refer to assessed properties required to be listed by Section 5(c)(2)(iii) of the Act. In short, the only procedure to challenge the assessment is the objection process in Sections 5(b)(3) ("Specific procedures") and 5(f)(2) ("Veto of final plan for NID"). Consequently, Objector asserts, if qualified objectors are not limited to properties to be assessed under the BID plan, the objection process does not accurately measure the property owners' consent to be assessed.

As additional support for his position, Objector cited Section 8(b) of the Act (titled "Request for termination"), which provides that any request for the "termination of the NID and NIDMA approved by 40% of the <u>assessed property owners</u>, in numbers, located in the NID, shall be submitted by the governing body of the municipality in writing." 73 P.S. §838(b) (emphasis added). Objector

7

asserted this provision is consistent with the understanding that the formal objection is limited to assessed property owners, and a proposed NID final plan is vetoed when the municipality counts objections from 40% or more of the assessed properties.

As a final point, Objector cited provisions from NID provisions of other municipalities limiting the right to object to only those property owners for whom the assessment is a legally binding obligation. See, e.g., Harrisburg Midtown Improvement District Draft (HMID) plan (R.R. at 79a). Objector cited similar provisions in a West Chester NID plan (R.R. at 54a-56a), and an article regarding a defeated NID plan in Easton (R.R. at 83a-87a) where only assessed property owners were counted in the veto vote.

In addition, Objector cited the Community Economic Improvement Act (CEIA),[4] which governs the establishment of BIDs in the City of Philadelphia. See R.R. at 82a. Section 3 of the CEIA defines "[a]ffected property owner" as "[a] property owner with respect to whom a special assessment fee is proposed to be or has been levied as authorized by this act." 53 P.S. §18103 (emphasis added). Further, Section 5(b) of the CEIA provides a 45-day period for objections by property owners subject to the assessment. 53 P.S. §18105(b). Prior to a 2016 amendment, if 51% of the assessed owners objected, the BID would be defeated. Id. The amendment lowered the veto threshold to one-third of affected property owners. See Section 5(b)(7) of the CEIA, 53 P.S. §18105(b)(7).

---

[4] Act of December 21, 1988, P.L. 1307, as amended, 53 P.S. §§18101-18112.

8

Objector further argued the objection process in the Act is made administratively feasible by using the list of assessed properties. There is a statutory presumption that each assessed property is benefited. The objection process provides each assessed owner with an opportunity to weigh whether the benefits outweigh the costs. If they do not, a rational, assessed owner may object.

Conversely, there is no requirement in the Act that non-assessed properties be benefited. Therefore, there is no basis to add the non-assessed properties to the assessed properties for the objection process.

**E. Trial Court's Decision**

In December 2016, the trial court issued an opinion and order granting the City's motion for summary judgment and dismissing Objector's declaratory judgment complaint. In so doing, the trial court recognized that the Act does not define the term "affected property owners." However, the trial court observed that Section 3 of the Act ("Definitions") defines the term "benefited property" as "[t]hose properties located within a [NID] which profit from district improvements based on a rational nexus test." 73 P.S. §833.

Although the trial court agreed with both parties that the General Assembly could have done a better job drafting the Act, the trial court noted that the Act did not use either the word "all" or the word "assessed" in determining which property owners were "affected" for purposes of registering an objection to a final plan under Section 5(f)(2). Therefore, the trial court used a dictionary

9

definition of the word "affected," which is defined as "acted upon; influenced." See Tr. Ct., Slip Op., 12/19/16, at 18 (citation omitted).

In addition, the trial court reviewed the parties' documentary evidence, which included affidavits from various individuals. Lebanon Mayor Sherry Capullo attested the upgrades and improvements flowing from the BID will have a positive effect on all property owners, including those exempt from assessment. Kimberly Kreider-Umble of the Lebanon Family Health Services, an exempt government agency, indicated that the BID positively affected her agency. The BID also positively affected the largest non-assessed property in the BID, the Lebanon Campus of the Harrisburg Area Community College (HACC Center). Laurie Bowersox, the executive director of the HACC Center stated in her affidavit that the recent cleanliness of the streets and improved lighting surrounding the building positively affected the property.

The trial court also reviewed affidavits from officials and directors from other BIDs. Malcom Johnstone, the executive director of the West Chester BID stated that West Chester considers all property owners to be affected by the BID, even if they are exempt from the assessment. Johnstone further stated that non-profits are beneficiaries of the BID programs.

Further, David Feehan, the president of Civitas Consultants, a consulting group that worked on the BID, stated that he worked with over 250 BIDs around the globe. Feehan stated that in virtually all cases tax exempt properties are positively affected and benefit from the creation of a BID.

10

Similarly, William Fontana, the executive director of the Pennsylvania Downtown Center, who has been involved in the creation and implementation of BIDs in Erie, Jenkintown and Scranton, stated that tax exempt properties are both benefited and positively affected by the BID activities and improvements.

Based on its review of the evidence, the trial court stated (with emphasis added):

> Sifting through the above, <u>no material issue of fact exists on the issue of whether the BID actually would 'affect' exempt properties</u>. <u>Clearly, the evidence and affidavits submitted by the [City] reveal that improvements such as upgraded lighting and enhanced security will benefit all property owners regardless of whether those owners are assessed a fee or not</u>. While [Objector] has attempted to convince us that only those with a financial stake should have a voice, <u>next to nothing has been presented by [Objector] to refute that the BID has and will continue to 'touch,' 'impact' and 'influence' non-assessed BID property owners</u>. <u>As to whether exempt property owners would be 'affected' by the BID, the answer is clearly 'yes.'</u>
>
> <u>Having concluded that all property owners within the designated district will be 'affected' by the BID, logic dictates that all such property owners must be included within the census used to evaluate whether the 40% objection threshold has been met</u>. In this case, both parties agree that 132 objections is not enough to defeat the BID if the total number of properties within the physical confines of the BID are counted. <u>Because we hold today that all such properties are 'affected' by the BID, we must also therefore conclude that the 132 objections lodged to the BID are insufficient to defeat it</u>. Hence, we are constrained to grant the [City's] Motion for Summary Judgment and dismiss [Objector's] declaratory judgment action.

Tr. Ct., Slip Op., at 21-22. Objector appeals.[5]

## II. Discussion

## A. Argument

Objector contends that the trial court erroneously construed the term "affected property owners" to include all properties located within the physical boundaries of the NID rather than only those properties assessed under the proposed final plan. To that end, Objector repeats his various arguments made before the trial court. Essentially, Objector asserts that only those who pay should have a say in voting on the final plan under Section 5(f)(2) of the Act.

As support for his position, Objector cites the City's "Central Business District: Business Improvement Feasibility Study – 2010," which states in part:

> The creation of a BID, as allowed under [the Act], is the preferred way for large cities, and increasingly mid- and small-size cities to attain this level of sustainability. The critical factor in the creation of a BID is that while it is approved and authorized by local government, it cannot be created without the consent of the property owners that pay the assessment and stand to benefit from its activities. In fact, the most important concept of the BID is that unlike a tax, it is a 'value-added' payment that

---

[5] On appeal from a trial court's order granting or denying summary judgment, our standard of review is *de novo* and our scope of review is plenary. Brewington v. City of Phila., 149 A.3d 901 (Pa. Cwmlth. 2016). Summary judgment is properly entered only when, "after examining the record in the light most favorable to the non-moving party, and resolving all doubts as to the existence of a genuine issue of material fact against the moving party, the moving party is clearly entitled to judgment as a matter of law." Pyeritz v. Commonwealth, 32 A.3d 687, 692 (Pa. 2011).

> local property owners should not only hope to benefit
> from, but in fact, should <u>expect</u> to benefit from. …

R.R. at 2a (emphasis added).

Therefore, Objector argues, the objection process and veto plan in Section 5(f)(2) is designed to measure consent to the assessment under the NID. Further, the definition of "rational nexus" in Section 3 of the Act, states that all owners of property within a NID "<u>paying a special assessment fee must benefit directly or indirectly from facilities and services provided by [an NID]</u>." 73 P.S. §833 (emphasis added). A rational property owner would object to an NID plan whose costs outweigh the benefits.

Conversely, the owners of tax exempt or non-assessed properties do not have a rational basis for weighing burdens against benefits. Their properties are not burdened by a mandatory assessment and there is no statutory mandate that non-assessed properties receive benefits. Thus, Objector contends exempt properties are not part of the veto process in Section 5(f)(2) of the Act.

Further, citing the Statutory Construction Act of 1972, 1 Pa. C.S. §§1501-1991, and the Supreme Court's decision in <u>Commonwealth v. Giulian</u>, 141 A.3d 1262 (Pa. 2016), Objector asserts, in construing statutory language and giving it effect, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear. <u>Giulian</u>.

Therefore, the use of the term "affected property owners" in Section 5(f)(2) necessarily implies the existence of unaffected property owners within the

13

boundaries of the proposed NID. As such, the trial court's essential substitution of the word "all" for "affected" on the theory that all property owners are affected is contrary to the intent of the General Assembly.

To that end, Objector points out that in Section 5(b)(1) of the Act ("Specific procedures"), the General Assembly states that the municipal corporation shall provide a copy of everything required in the procedure of creating an NID "to all property owners and lessees of property owners located in the proposed [NID] at least 30 days prior to the first public hearing …." 73 P.S. §835(b)(1) (emphasis added). As such, Objector asserts, the General Assembly knows how to state "all property owners" when it means all property owners.

Objector repeats his trial court argument that longstanding Pennsylvania case law makes it clear that special assessments can be justified only by benefits received by the properties subject to the assessments. See Hammet; S.O.L. Club; Pace Motels. Further, when the words of a statute are not explicit, legislative intent may be ascertained from former laws, if any, upon the same or similar subjects. 1 Pa. C.S. §1921(c).

As is typical of statutes authorizing special assessments, Objector asserts, Section 7(b)(5) of the Act (pertaining to assessments by NIDMAs) provides for apportioning costs among the benefited properties. In particular, Section 7(b)(5)(iii) provides that the total cost of the improvements and services provided by the NID may be assessed by equitably apportioning costs "among benefiting properties." 73 P.S. §837(b)(5)(iii) (emphasis added). As discussed

14

above, the term "benefiting properties" are those assessed properties that have a "rational nexus" with a direct or indirect benefit conferred by the NID. See 73 P.S. §833 (definition of rational nexus).

Therefore, Objector asserts, Section 5(b)(3) ("Specific procedures"), relating to objections by 40% of the "benefited properties," and Section 5(f)(2) ("Veto of final plan for NID"), relating to 40% or more of "affected property owners" both refer to the assessed properties required to be listed by Section 5(c)(2)(iii) of the Act.

Objector also cites Section 8(b) of the Act ("Request for termination"), which provides that any request for the "termination of the NID and NIDMA approved by 40% of the assessed property owners, in numbers, located in the NID shall be submitted by the governing body of the municipality in writing." 73 P.S. §838(b) (emphasis added). Objector asserts this provision is consistent with the understanding that the formal objection process in Section 5 is limited to assessed property owners, and a proposed NID final plan is vetoed when the municipality counts objections from 40% or more of the assessed properties.[6]

---

[6] Objector also cites provisions from NIDs of other municipalities which he contends limit the right to object to only those property owners for whom the assessment is a legally binding obligation. See, e.g., Harrisburg Midtown Improvement District Draft (HMID) plan (R.R. at 79a); West Chester NID plan (R.R. at 54a-56a). Objector also cites an article regarding a defeated NID plan in Easton (R.R. at 83a-87a), where only assessed property owners were counted in the veto vote.

In addition, Objector cites the Community Economic Improvement Act (CEIA), which governs the establishment of BIDs in the City of Philadelphia. As discussed above, Section 3 of the CEIA defines "[a]ffected property owner" as "[a] property owner with respect to whom a special assessment fee is proposed to be or has been levied as authorized by this act." 53 P.S. §18103 (emphasis added). Further, Section 5(b) of the CEIA provides a 45-day period following **(Footnote continued on next page…)**

## B. Analysis

### 1. Affected Property Owners

Initially, we agree with the trial court that the primary issue before us is who constitutes an "affected property owner" for purposes of vetoing a final plan under Section 5(f)(2) of the Act. Objector contends that term must be limited to the 280 assessed properties in the proposed BID final plan. The City, on the other hand, argues that every property in the BID may be affected by the BID and thus should be entitled to vote for or against the BID final plan. As such, the City contends that the 78 tax-exempt properties must be included in the vote on the final plan under Section 5(f)(2).

### 2. Principles of Statutory Construction

In <u>Malt Beverages Distributors Association v. Pennsylvania Liquor Control Board</u>, 974 A.2d 1144 (Pa. 2009), the Supreme Court recognized that the primary object of statutory construction is to ascertain and effectuate legislative intent. 1 Pa. C.S. §1921(a). In pursuing this end, the Court noted that when the words of a statute are clear and free from all ambiguity, the letter of the statute is not to be disregarded under the pretext of pursuing its spirit. 1 Pa. C.S. §1921(b).

---

**(continued…)**

a hearing on the final plan for objections by property owners subject to the assessment. 53 P.S. §18105(b). Prior to a 2016 amendment, if 51% of the assessed owners objected, the BID would be defeated. <u>Id.</u> The amendment lowered the veto threshold to one-third of the properties owned by affected property owners within the NID or one-third of the total property valuation of property owned by affected property owners within the NID. Section 5(b)(7), 53 P.S. §18105(b)(7).

16

As a general rule, the best indication of legislative intent is the plain language of a statute. Malt Beverages.

In reading the plain language of a statute, the words and phrases shall be construed according to rules of grammar and in accord with their common and approved usage, while any words or phrases that have acquired a peculiar and appropriate meaning must be construed according to that meaning. 1 Pa. C.S. §1903(a). It is only where the words of a statute are not explicit that resort to statutory construction is appropriate. 1 Pa. C.S. §1921(c). Finally, in ascertaining legislative intent, it is presumed that the General Assembly did not intend a result that is absurd or unreasonable. 1 Pa. C.S. §1922(1).

### 3. Relevant Act Provisions

Turning to the provisions of the Act relevant to this case, we first note that Section 2 of Act ("Legislative findings") pertinently provides:

> (4) Municipalities shall be given the broadest possible discretion in establishing by local ordinance the type of assessment based programs most consistent with neighborhood needs, goals and objectives as determined and expressed by property owners in the designated district.

73 P.S. §832(4) (emphasis added).

Section 3 of the Act ("Definitions") defines "Benefited property" as: "Those properties within a neighborhood improvement district which profit from district improvements based on a rational nexus test. Properties need not profit equally to be considered to have benefitted." 73 P.S. § 833. It is significant to our

17

analysis that the word "assessed" does not appear in this definition. Expressed differently, the definition of "benefited property" does not state that it means the same thing as "assessed property."

Also, Section 3 of the Act defines a "Neighborhood Improvement District" as:

> A limited geographic area within a municipality, in which a special assessment is levied on all designated property, other than tax exempt property, for the purpose of promoting the economic and general welfare of the district and the municipality, hereinafter referred to as NID. Such districts shall be referred to generally as neighborhood improvement district and specifically as business improvement district (BID), residential improvement district (RID), industrial improvement district (IID), institutional improvement district (INID) or mixed-use improvement district (MID), depending on the type of district established. A designated property may not be included in more than one neighborhood improvement district.

73 P.S. §833 (emphasis added). Further, Section 3 defines a "Neighborhood improvement district plan" as:

> The strategic plan for neighborhood improvements required by [Section 5 of the Act] , hereinafter referred to as NDIP, and all projects, programs and supplemental services to be provided within the district to implement the plan by the neighborhood improvement district management association.

Id. In addition, Section 3 defines a "Neighborhood improvement district management association" as:

18

> The governing body which oversees the management of neighborhood improvement districts in a municipality as established under [Section 5 of the Act] which shall be referred to as the NIDMA. Such body shall be incorporated as a nonprofit corporation in this Commonwealth or an authority ….

Id.

Section 5 of the Act governs the "Creation of a neighborhood improvement district." 73 P.S. §835. Section 5(b) ("Specific procedures") provides:

> (1) A copy of everything required under this section, as well as the date, location, and time of any public hearing required by this act shall be provided by the municipal corporation <u>to all property owners and lessees of property owners located in the proposed NID</u> at least 30 days prior to the first public hearing required by this section.
>
> (2) At least one public hearing, no earlier than 15 days apart, <u>for the purpose of receiving public comment from affected property owners within the proposed NID,</u> on the proposed NIDP, shall be held by the municipality before the establishment of an NID. Notice of the hearing shall be advertised at least ten days prior thereto in a newspaper of general circulation.
>
> (3) <u>Any objections by property owners within the proposed NID must be made in writing by persons representing the ownership of 40%, in numbers, of the benefited properties within the NID</u>. Objections must be signed by the property owner and filed in the office of the clerk for the governing body of the municipality in which the NID is proposed.

53 P.S. §835(b)(1)-(3) (emphasis added).

19

Section 5(c) of the Act establishes the required "[c]ontents of preliminary plan."  73 P.S. §835(c).  Subsection (c)(1) requires that a map be prepared indicating the boundaries of the NID.  73 P.S. §835(c)(1).  Subsection (c)(2) specifies the contents of a written report which must be provided by the municipality.  73 P.S. §835(c)(2).

More importantly, Subsection (c)(3) requires that the preliminary plan also:

> (iii) Allow for and encourage tax-exempt property owners located within the NID to provide in-kind services or a financial contribution to the NIDMA, if not assessed, in lieu of a property assessment fee.
>
> * * * *
>
> (vii) Provide that a negative vote of at least 40% of the property owners within the NID proposed in the final plan shall be required to defeat the establishment of the proposed NID by filing objections with the clerk for the governing body of the municipality within 45 days of presentation of the final plan where the governing body of [the] municipality is inclined to establish the NID.

73 P.S. §835(c)(3)(iii), (vii) (emphasis added).  Pertinent to our resolution, the preliminary plan must allow for and encourage tax-exempt property owners to financially support the NID even "if not assessed."

Section 5(d) of the Act provides:

> (d) Final plan.—Prior to the establishment of an NID, the municipality shall submit a revised final plan to property owners located within the proposed NID which incorporates changes made to the plan based on

20

comments from affected property owners within the NID provided at the public hearings or at some other time. Changes to the final plan which differ from the preliminary plan shall be so indicated in an easily discernable method for the reader, including, but not limited to, changes being in boldfaced or italicized type.

73 P.S. §835(d) (emphasis added).

Section 5(e) of the Act states:

**(e) Public hearing**—At least one public hearing for the purpose of receiving public comment on any revisions to the preliminary plan made following suggestions by affected property owners within the proposed NID and reflected in the final NIDP shall be held by the municipal corporation before enacting an ordinance establishing an NID. Notice of the hearing shall be advertised at least ten days prior thereto in a newspaper of general circulation in the municipality.

73 P.S. §835(e).

The provision at the heart of this case, Section 5(f) of the Act, governs the veto of a final plan. Section 5(f), in its entirety, provides:

**(f) Veto of final plan for NID.—**

(1) Following the last public hearing required under subsection (e) or under subsection (g) if an amendment to the final plan, affected property owners located within a proposed NID shall have 45 days from the date of the hearing to object and to disapprove the final plan or any amendment to the final plan under the requirements of subsection (b)(3).

(2) If 40% or more of the affected property owners within the proposed NID fail to register their disapproval

21

> of the final plan or amendment to the final plan in writing with the clerk of the governing body of the municipality in which the NID is proposed, the governing body of the municipality, may, following the 45-day period, enact a municipal ordinance establishing an NID under this act or, in the case of an amendment to the final plan, adopt any amendments to the ordinance.

73 P.S. §835(f)(1), (2) (emphasis added).


### 4. Construction of Act Provisions

In reviewing the language of the above statutory provisions, we first note that Section 2(4) expresses the legislative intent that municipalities be given the "broadest possible discretion" in establishing a NID consistent with the neighborhood needs, goals and objectives as determined and expressed by property owners in the designated district." 73 P.S. §832(4) (emphasis added). Unlike other Act provisions, Section 2(4) does not the use the adjectives "benefited," "affected," of "assessed" in limiting the type of property owners who may participate in the decision to create an NID.

Nonetheless, in defining a NID, Section 3 of the Act expressly states that "tax exempt property" will not be subject to the special assessment levied on "all designated property." 73 P.S. §833 (emphasis added).

Also, Section 3 defines the term "[b]enefited property" as "[t]hose properties located within a neighborhood improvement district which profit from district improvements based on a rational nexus test." Id. Evaluating the plain language of the definition, we note that the word "assessed" does not appear. Thus, while all properties which are assessed must be benefited, as determined

22

under a rational nexus test, see id. (definition of "rational nexus"), the Act does not mandate that all benefited properties be assessed. Indeed, the Act recognizes that there will be "tax exempt property." See id.

We will now evaluate the plain language of Section 5 of the Act. Section 5(b)(1) of the Act, addressing specific procedures for creating a NID, requires that "all property owners and lessees of property owners located in the proposed NID" receive a copy of the necessary documents and notice of a public hearing on the proposed NID. 73 P.S. §835(1) (emphasis added). Section 5(b)(2), also addressing specific procedures for creating a NID, provides for a public hearing for the purpose of receiving public comment from affected property owners within the NID on the proposed NID plan. 73 P.S. §835(2).

Section 5(b)(3) of the Act, also addressing specific procedures for creating a NID, provides for written objections by property owners within the proposed NID. This provision requires objections by "persons representing the ownership of 40%, in numbers, of the benefited properties within the NID." 73 P.S. §835(3) (emphasis added).

Reviewing the plain language of the objection procedure described in Section 5(b)(3), we note that the objection procedure is not expressly limited to assessed properties. This reading makes sense. While assessed properties must be benefited to be assessed, not all benefited properties will be assessed. Indeed, some properties may be exempt from assessment, but the owners may be encouraged nevertheless to provide in-kind services or financial contributions in

23

lieu of a property assessment fee.  See Section 5(c)(3)(iii) of the Act, 73 P.S. §835(c)(3)(iii).  In light of this possible voluntary support from exempt but benefited properties, all benefited properties are included in this objection procedure for creating a NID.  Thus, in the context of the objection procedure, the term "benefited" is not synonymous with the term "assessed."

Consistent with the foregoing, Section 5(c)(3) requires that a preliminary plan also provide notice that "a negative vote of <u>at least 40% of the property owners within the NID</u> proposed in the final plan shall be required to defeat the establishment of the proposed NID …."  77 P.S. §835(c)(3)(vii) (emphasis added).

Notably, this preliminary plan notice language does not use the term "assessed" in describing the property owners who may vote to defeat a proposed final plan for a NID.  Instead, there are no express limitations on the owners of properties within the NID whose votes on the final plan will be counted.  A plain language reading of this provision supports the conclusion that the votes of all owners of property within the NID will be considered in determining whether establishment of the proposed NID is defeated.

Also consistent with the foregoing, Section 5(d) of the Act ("Final plan") requires that "[p]rior to the establishment of an NID, the municipality shall submit a revised final plan <u>to property owners located within the proposed NID</u> which incorporates changes made to the plan <u>based on comments from affected property owners within the NID</u> provided at the public hearings or at some other

24

time." 73 P.S. §835(d) (emphasis added). Thus, the final plan is submitted to "property owners" in the NID, without limitation. Also, "affected property owners" may provide public comment regarding the proposed NID. 73 P.S. §835(b)(2). Accordingly, a property owner need not be subject to assessment before he or she is entitled to receive the final plan and provide public comment on it.

Similarly, Section 5(e) of the Act ("Public hearing") provides for a public hearing on any revisions to the preliminary plan made following suggestions by "affected property owners" within the proposed NID. 77 P.S. §835(e) (emphasis added). Again, the revisions are not limited to those by owners of NID properties to be assessed.

Finally, the language in Section 5(f) of the Act ("Veto of final plan for NID"), the most pertinent provision, is consistent with the foregoing. Section 5(f)(1) provides a 45-day period following the hearing for "affected property owners located within the proposed NID to object to and disapprove the final plan …." 77 P.S. §835(f)(1) (emphasis added). Further, as previously discussed, Section 5(f)(2) provides: "If 40% or more of the affected property owners fail to register their disapproval of the final plan … the governing body of the municipality may, following the 45-day period, enact a municipal ordinance establishing an NID." 77 P.S. §835(f)(2) (emphasis added).

Neither subsection 5(f)(1) nor 5(f)(2) refers to "assessed properties" at all. Given the absence of the term "assessed" in these controlling veto provisions,

25

given the absence of the term "assessed" in the objection procedures of Section 5(b), given the absence of the term "assessed" in the definition of the term "[b]enefited property" in Section 3, and acknowledging the possibility of voluntary support by owners of exempt property within the NID, a plain language reading of the Act leads to the conclusion that the objections of all owners of property affected by the NID could be counted toward determining whether the veto threshold has been reached, regardless of whether the properties are assessed.

## 5. In *Pari Materia*

Objector, however, contends Section 5(b)(3)'s (pertaining to specific procedures for creation of NID) use of the words "benefited properties" should be read in *pari materia* with Section 5(f)(2)'s (relating to veto of final plan for NID) use of the words "affected property owners" because both terms refer to the same subject and share a common purpose.

As discussed above, while assessed properties must be benefited to be assessed, not all benefited properties will be assessed. Some properties may be exempt from assessment, but the owners may be encouraged nevertheless to provide in-kind services or financial contributions in lieu of a property assessment fee. <u>See</u> Section 5(c)(3)(iii) of the Act, 73 P.S. §835(c)(3)(iii). Thus, within the context of the objection procedure in Section 5(b)(3), the term "benefited" is not synonymous with the term "assessed." In other words, the larger set of properties "benefited" by a NID includes the smaller group of properties "assessed," but the set of properties "benefited" can extend to other properties as well.

26

Even if Objector is correct that Section 5(b)(3) (specific procedures for creation) and Section 5(f)(2) (veto of final plan for NID) must be read in *pari materia*, he would not prevail. This is because neither of those provisions uses the term "assessed properties," and, as demonstrated in the foregoing discussions, those provisions address a set of properties larger than the smaller group of properties "assessed." As explained at length above, such a conclusion is consistent with reading <u>all</u> the relevant provisions of Section 5 of the Act (relating to creation of a NID) together.

**6.** *Expressio Unius est Exclusio Alterius*

Nevertheless, Objector points out that Section 8(b) of the Act (relating to a request for termination of an NID), provides that any request for the "termination of the NID and NIDMA approved by 40% of the <u>assessed property owners</u>, in numbers, located in the NID shall be submitted by the governing body of the municipality in writing." 73 P.S. §838(b) (emphasis added). Objector asserts this provision is consistent with the understanding that the formal objection process is limited to assessed property owners, and a proposed NID is vetoed when the municipality counts objections from 40% or more of the assessed properties.

Based on the different language of this provision, we disagree. Clearly, in Section 8(a) of the Act, the General Assembly used the specific term "assessed property owners" rather than "affected property owners." Under the statutory construction principle commonly known by the Latin term *expressio unius est exclusio alterius* (the express mention of a specific matter in a statute implies the exclusion of other not mentioned), where "the legislature includes

27

specific language in one section of a statute and excludes it from another, it should not be implied where excluded." W. Penn. Allegheny Health Sys. v. Med. Care Availability & Reduction of Error Fund., 11 A.3d 598, 605-06 (Pa. Cmwlth. 2010).

The General Assembly could have used the phrase "assessed property" in Section 5 of the Act if that is what it intended. However, the General Assembly chose the broader terms "benefited property" and "affected property" for purposes of creating a NID. There is a rational purpose to the use of the broader terms: inclusion of a broader set of property owners beyond those who may be assessed in the hope of voluntary support from owners of exempt but benefited properties. See Section 5(c)(3)(iii) of the Act, 73 P.S. §835(c)(3)(iii).

In contrast, when terminating a NID, the General Assembly intended a narrower group of voters, those owners of property in a NID actually paying assessments. However, pursuant to the express terms of the termination provision, "assessed property owners" do not have "veto" authority. Instead, a request for termination of a NID by a vote of 40% of the "assessed property owners" is referred to the governing body of the municipality for further action. Section 8(b) of the Act, 73 P.S. §838(b). Thus, in several different ways, the creation and termination processes in the Act are dissimilar.

**7. CEIA**

We recognize that Section 3 of CEIA, which governs the proposed BIDs in the City of Philadelphia, defines "[a]ffected property owner" as "[a]

28

property owner with respect to whom a special assessment fee is proposed to be or has been levied as authorized by this act." 53 P.S. §18103 (emphasis added). However, the CEIA is a different statute pertaining only to Philadelphia. As discussed above, no similar definition of it is included in the Act.

### 8. Other Municipal Ordinances

Similarly, Objector cites provisions from other municipal NIDs limiting voting on the final plan to assessed property owners. As noted above, under Section 2(4) of the Act ("Legislative findings"), municipalities are afforded the "broadest possible discretion" in drafting their local ordinances. 73 P.S. §832(4). Consequently, the provisions in other municipal NIDs explicitly limiting voting on the final plan to assessed property owners are not useful here.

Given the different statutory language in the Act, which does not use the term "assessed properties" in evaluating the vote to create a NID, but instead uses broader terms, we discern no error or abuse of discretion in the trial court's use of the common dictionary definition of "affected" in determining the meaning of the phrase "affected property owners." As indicated by the affidavits cited by the trial court, non–assessed or tax-exempt property owners are nonetheless affected ("acted upon"[7]) by their inclusion in this BID. As such, Section 5 of the Act does not foreclose their right to participate in the creation of this BID.

---

[7] See Webster's Third New World International Dictionary 35 (unabridged 1961) which defines "affect" in part as to "act upon" or "to produce an effect upon."

29

For all these reasons, we affirm the trial court's order entering judgment for the City and dismissing Objector's declaratory judgment action.


_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edward J. Schock,          :
            Appellant     :
                         :    No. 40 C.D. 2017
        v.                :
                         :
City of Lebanon           :

## **O R D E R**

**AND NOW**, this 4th day of August, 2017, for the reasons stated in the foregoing opinion, the order of the Court of Common Pleas of Lebanon County is **AFFIRMED**.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Edward J. Schock,  :
            Appellant  :
                              :
             v.  :  No. 40 C.D. 2017
                              :  ARGUED:  June 5, 2017
City of Lebanon  :

**BEFORE:**    **HONORABLE ROBERT SIMPSON, Judge**
                    **HONORABLE ANNE E. COVEY, Judge (P)**
                    **HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge**

**DISSENTING OPINION BY**
**SENIOR JUDGE LEADBETTER**                **FILED:  August 4, 2017**

      I must respectfully dissent. I agree with the Objector's arguments outlined on pages 13-15 of the proposed majority opinion. I find particularly persuasive that, as the trial court found, all property owners will be impacted in some way by the NID, and this is not in any way unique to the NID at issue, but will generally be the case. Therefore, by designating a limited class of "affected" property owners entitled to vote under Section 5(f)(2), the General Assembly cannot have intended that to mean all property owners. When it intended to mean "all property owners" it said so in Section 5(b)(1). Certainly, as the majority points out, the Act does not use the term "assessed" in Section 5(f)(2), but neither does it use the term "all."  I agree that the statutory language could be clearer but, for the other reasons cited by Objector, I believe that interpreting "affected" to mean "assessed" is closer to the statutory intent than interpreting "affected" to mean "all."

                                      _____
                                      **BONNIE BRIGANCE LEADBETTER,**
                                      Senior Judge