**[J-88-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| EDWARD J. SCHOCK, | : | No. 79 MAP 2017 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 40 CD |
| | : | 2017 dated 8/4/17 affirming the order of |
| | : | the Lebanon County Court of Common |
| v. | : | Pleas, Civil Division, at No. 2016-00423 |
| | : | dated 12/19/16 |
| CITY OF LEBANON, | : | |
| | : | |
| Appellee | : | |
| | : | |
| | : | ARGUED: December 4, 2018 |

**OPINION**

**CHIEF JUSTICE SAYLOR**                                                      **DECIDED: May 31, 2019**

This appeal concerns the Neighborhood Improvement District Act and, more specifically, the statutory procedure permitting the rejection of a proposed improvement district by certain local property owners.

**I. Background**

Under the Neighborhood Improvement District Act,[1] a Neighborhood Improvement District (an "NID") is a geographically-defined area of a city targeted for certain public improvements, programs and/or services. *See* 73 P.S. §833.  In

---

[1] Act of Dec. 20, 2000, P.L. 949, No. 130 (as amended 73 P.S. §§831-840) ("NIDA" or the "Act").

connection with the establishment of an NID, a non-profit corporation, known as a Neighborhood Improvement District Management Association (a "NIDMA"), is designated or incorporated to serve as the governing body. *See id.*; *see also id.* §836. Once an NID is created, municipalities may fund the improvements via the issuance of bonds and then retire the bonds, at least in part, by assessing ongoing fees against properties within the NID. *See id.* §834(5), (7). Monies generated by the excisions may also be used to fund ongoing programs and services within the district. *See id.* §834(4), (10).

The fees are generally regarded as "special assessments" as contrasted with general taxation, given that the excisions are imposed only upon property in a defined locale to fund special or local improvements, programs, and/or services. *See* 14 McQuillin Mun. Corp. §38.1 (3d ed. 2018). Special assessments generally are "valid only if they are imposed in an amount that does not exceed the special benefit conferred on the assessed property by the improvement." *Id.* §38:6; *accord City of Phila. ex rel. Vulcanite Paving Co. v. Pemberton*, 208 Pa. 214, 217, 57 A. 516, 517 (1904).

Under the Act, some properties within an NID, depending on their use, may be exempted from fees. *See* 73 P.S. §§835(c)(3)(iii), 837(b)(1). It is the existence of exempt properties that has led to this litigation.

In 2010, Appellee, the City of Lebanon (the "City"), was considering creation of a business improvement district (a "BID"), a type of NID, *see id.* §833, to revitalize its downtown area. Proceeding according to NIDA, and assisted by a consulting firm, the steering committee for the Downtown Lebanon Business Improvement District (the "Lebanon BID") conducted a feasibility study and developed a preliminary plan. *See id.* §§834(3)(ii), 835(c). This preliminary plan reflected, among other things, that there

were 358 properties within the proposed BID, of which 78 were exempt from assessment. This left 280 properties subject to assessment.

Under the heading of "Service Area," the preliminary plan indicated that:

> The Lebanon [BID] will encompass all commercial and residential investment properties within the downtown centered on the commercial portions of Cumberland, Chestnut and Willow Streets -- generally parcels zoned Commercial Business District. *No owner-occupied residential properties are being considered for the BID* unless they are part of a commercial or residential investment property.

Lebanon BID Preliminary Plan, at 4 (Sept. 2015) (emphasis added).[2] Below the heading of "Eligible Properties," the preliminary plan stated:

> Properties considered eligible for Lebanon BID assessments and services are all *parcels with a commercial and/or residential investment use* located within the BID boundary identified above. Specifically, these properties include retail, office, warehouse, industrial, medical, mixed-use (containing a combination of the above including residential), and residential investment. Properties whose use is listed exclusively as owner-occupied residential or are determined to be tax-exempt in the Lebanon County Assessor's Office will be exempt from the BID assessment and services.

*Id.* (emphasis added). Confusingly, the preliminary plan contained an appendix, entitled "Eligible Properties Contained within Lebanon BID Boundary" which encompassed all properties within the geographic boundaries of the Lebanon BID, *see id.*, Appendix 2,

---

[2] To the degree that the preliminary plan suggested that exempt properties would not be considered as being encompassed in the Lebanon BID, other provisions of the plan are inconsistent, and no party herein takes the view that a property within the geographic boundaries of a BID is not encompassed in the BID. Nevertheless, the above language exemplifies the lack of clarity in the materials submitted by the City to property owners which, as explained below, appears to derive, at least in part, from material ambiguities in the governing statute.

despite the plan's relatively clear implication that tax exempt properties were not "Eligible Properties."[3]  By way of subheadings and descriptive notes, the appendix nonetheless distinguished between properties subject to the assessments and those that were exempt.

The City arranged for a packet of materials, including the preliminary plan, to be mailed to owners and lessees of real property located within the geographic boundaries of the proposed Lebanon BID.  *See* 73 P.S. §835(b)(1).  A cover letter invited participation in a public hearing.  *See id.* §835(b)(2).

After the hearing, at which citizens voiced their comments, the City accepted the plan as final and sent another letter to property owners and lessees within the proposed BID, advising how to file an objection, or to vote against the establishment of the Lebanon BID.  *See id.* §835(f)(1) (captioned "Veto of final plan for NID").  The letter explained that no action was necessary to register a "yes" vote, and that "objections from at least 40% of the *benefited property owners* within the district boundaries are required to defeat the establishment of the BID."  Letter of Cindy Heisey, Lebanon BID Steering Committee Chair, dated November 20, 2015, at 1 (emphasis added).

Significantly, "[b]enefited property" is a defined term under NIDA, connoting "[t]hose properties located within a neighborhood improvement district which profit from district improvements based on a rational nexus test."  73 P.S. §833.[4]  Notably, as well, Section 5(f)(2) of the Act authorizes a municipality to proceed with an NID "[i]f 40% or

---

[3] Notably, as well, the Act requires only that a list of the properties to be assessed be included in a preliminary plan, *see* 73 P.S. §835(c)(2)(iii); the enactment says nothing about identifying exempt properties.

[4] As discussed further below, "rational nexus" is also a defined term under the Act.  *See id.*

more of the *affected property owners* within the proposed NID fail to register their disapproval of the final plan[.]" *Id.* §835(f)(2) (emphasis added). Thus, the City implicitly equated owners of "benefited properties" with the undefined term "affected property owners" in a material depiction of the statutory veto procedure distributed to property owners and lessees.[5]

The City received valid objections from assessed property owners attaching to 132 of the non-exempt properties. This number represents less than 40% of the Lebanon BID's total number of properties (358), but more than 40% of its non-exempt properties (280). Positing that both exempt and non-exempt property owners constituted "affected property owners" for Section 835(f)(2) purposes, the City proceeded with the Lebanon BID.[6]

Appellant, the owner of a non-exempt property in the Lebanon BID, commenced a civil action in the county court under the caption: "Complaint for Declaratory Judgment to Declare Bid Dead." In the complaint, Appellant advanced the position that, under NIDA, "the objection threshold is 40% of the *assessed* parcels," as opposed to forty

---

[5] As explained below, the City's approach in this respect comports with a reading of Section 5(f)(2) of the Act in its context among other provisions of the Act. The City, however, has abandoned this approach in the present litigation. Instead, its position now reconciles more closely with the final plan itself, which contemplated voting by an unqualified group of "the property owners within the BID[.]" Lebanon BID Plan distributed November 20, 2015, at 6.

Parenthetically, while the plan advised that "at least 40% of the property owners within the BID proposed in the final plan shall be required to file objections," *id.*, contrary to the Act, the plan itself failed to indicate that satisfaction of this requirement will defeat the establishment of the proposed BID. *See* 73 P.S. §835(c)(3)(vii).

[6] A single objection was lodged by an exempt property owner, such that the total number of valid objections submitted by the property owners at large was also less than 40%.

percent of *all* parcels within the geographic boundaries of a BID. Complaint in *Schock v. City of Lebanon*, No. 2016-00423 (C.P. Lebanon), at 2 (emphasis added).[7] Given that, by his calculus, only the owners of 280 properties within the geographic boundaries of the BID were eligible to vote, Appellant concluded that the final plan had been vetoed by the 132 negative votes.

Implicit in the complaint and Appellant's initial supportive submissions was his underlying position that the term "affected property owners," as used in the Act's veto provision for final plans, is ambiguous and should be analyzed according to its context. In this regard, Appellant relied principally upon two other of NIDA's provisions. First, he explained that, in specifying the contents of a preliminary plan, Section 5(c)(2)(iii) of the enactment requires inclusion of "[a] list of all properties *to be assessed*" but says nothing about exempt properties. 73 P.S. §835(c)(2)(iii) (emphasis added); *see also supra* note 3. From this, Appellant invited the inference that "[n]on-assessed properties simply are not relevant to NIDA's objection process." Complaint in *Schock*, No. 2016-00423, at ¶9.

Next, Appellant pointed to Section 5(b)(3), which prescribes that:

> Any objections by property owners within the proposed NID must be made in writing by persons representing the

---

[7] Appellant's position in this respect aligned with the original feasibility study commissioned by the City, which stated:

> The critical factor in the creation of a BID is that while it is approved and authorized by local government, it cannot be created without the *consent of the property owners that pay the assessment* and stand to benefit from its activities.

City of Lebanon -- Central Business District: Business Improvement Feasibility Study -- 2010, at 1 (emphasis added).

ownership of 40%, in numbers, of *the benefited properties* within the NID.

73 P.S. §835(b)(3) (emphasis added). Appellant stressed that, under the Act, "benefited property" is couched in terms of a rational nexus test, *see id.* §833, with "rational nexus" being defined as:

> The legal principle which requires that there is a rational, definable benefit which accrues to *any property owner assessed a fee* for said benefit in a neighborhood improvement district created under this act. All property owners within a designated neighborhood improvement district *paying a special assessment fee* must benefit directly or indirectly from facilities or services provided by a neighborhood improvement district management association within the neighborhood improvement district, provided, however, that property owners need not benefit equally.

*Id.* (emphasis added). Appellant further noted that "benefited property" is a term of art in the field of special assessments, connoting the use of a rational nexus test in resolving challenges to monetary exactions grounded on the claim that the burden of the assessment is disproportionate to the value of the benefit conferred. *See generally* 14 MCQUILLIN MUN. CORP. §38.6. Given the integral role of assessments in the rational-nexus calculus, and the association between rational nexus and status as a "benefited property" under the Act, Appellant reasoned that the statutory veto procedure encompasses only owners who will absorb the fees. *See* Complaint in *Schock*, No. 2016-00423, at ¶16 ("Under NIDA's objection process, only the ones who have to pay have the say.").

In terms of Section 5(f)'s specific procedure for veto of a final plan, it was Appellant's position that this section refers to the same objection process as Section 5(b)(3). *Accord* 73 P.S. §835(f)(1) (indicating that objections to a final plan are to be considered "under the requirements of subsection (b)(3)"). Therefore, Appellant

reasoned that "[t]he benefited properties of [Section 5(b)(3)] are synonymous with the affected properties of [Section 5(f)(2)]." Complaint in *Schock*, No. 2016-00423, at ¶11.

The City filed preliminary objections in the nature of a demurrer, contending that the term "affected property owners," in Section 5(f)(2), unambiguously encompasses *all* of the owners of properties within the geographic boundaries of a BID, regardless of whether they will be subject to or exempt from monetary assessments. *See* Preliminary Objections in *Schock*, No. 2016-00423, at ¶5 ("The statute is clear that it is not only the *assessed* property owners who have a say, but it is also the *affected property owners*, whether or not they are assessed, who have a say in the process." (emphasis in original)). In this regard, the City relied on a broad, dictionary-based definition of "affected." *See, e.g.*, Brief in Support of Preliminary Objections in *Schock*, No. 2016-00423, at 8 ("The plain meaning of the word 'affected' as used in the statute, which is to produce an effect on or influence, makes it clear that *all* properties should be included in the tally of objectors." (emphasis in original)). The City also highlighted the legislative findings associated with NIDA, and in particular, the passage indicating that:

> [m]unicipalities should be given the broadest possible discretion in establishing by local ordinance the type of assessment-based programs most consistent with neighborhood needs, goals and objectives as determined and expressed by property owners in the designated district.

73 P.S. §832(4).

The common pleas court overruled the preliminary objections on the basis that factual development was needed to determine whether owners of non-assessed properties were "affected property owners" for purposes of Section 5(f)(2)'s veto procedure. *Id.* §835(f)(2). Accordingly, the common pleas court directed the parties to proceed with the pleadings and discovery.

In its answer, the City took the opportunity, for the first time in the litigation, to address Appellant's position that the owners of "benefited properties" under Section 5(b)(3) were the "affected property owners" for purposes of Section 5(f)(2). In this respect, and at this stage, the City argued that "affected" is broader in scope than "benefited." *See* Answer in *Schock*, No. 2016-00423, at ¶11 (positing that "an owner in fee simple of a property that might deem oneself harmed by this new process would not be 'benefited' but would clearly fit the class, 'affected'").[8]

During discovery, several individuals, including the City's mayor, the director of a BID in West Chester, and the president of the consulting firm the City enlisted to aid in formulating the Lebanon BID plan, contributed affidavits.[9] These individuals generally attested that the civic improvements flowing from implementation of a BID – such as cleaner streets, improved lighting, and better security – have a positive effect on all properties, including non-assessed ones.

At the close of discovery, the parties filed cross-motions for summary judgment. The City maintained its position that "affected" should be accorded its ordinary meaning and argued that the evidence clearly showed that exempt properties, including residential lots and those dedicated to religious, educational, and nonprofit healthcare work, were "affected" by a BID. Moreover, according to the City, excluding exempted

---

[8] Notably, given that the operative statutory term in Section 5(f)(2) is "affected," this position is inconsistent with the City's letter to property owners and lessees describing the voting procedure, which, as related above, indicated that objections from at least forty percent of "benefited property owners" were required to defeat the proposed Lebanon BID. Letter of Cindy Heisey, Lebanon BID Steering Committee Chair, dated November 20, 2015, at 1.

[9] Other affiants included an employee of Lebanon Family Health Services (an exempt government agency), the executive director of the Lebanon Campus of Harrisburg Area Community College, and the executive director of the Pennsylvania Downtown Center, who was involved with the creation of BIDs in Erie, Jenkintown, and Scranton.

property owners from the objection process would yield an absurd or unreasonable result. *See* 1 Pa.C.S. §1922(1) (embodying the presumption that the General Assembly does not intend such a result in the enactment of a statute).

The City also drew support from other provisions of NIDA. First, the City explained that it was required, under Section 5(b)(1) of the Act, to send the preliminary plan and associated documents to "*all property owners* and lessees of property owners located in the proposed NID," 73 P.S. §835(b)(1) (emphasis added), just as a revised final plan must also be submitted to an unqualified group of "property owners located within the proposed NID," *id.* §835(d) (emphasis added). Additionally, the City pointed to the requirement, in Section 5(c)(3)(vii), for a preliminary plan to "[p]rovide that a negative vote of at least 40% of *the property owners within the NID* proposed in the final plan shall be required to defeat the establishment of the proposed NID[.]" *Id.* §835(c)(3)(vii) (emphasis added).[10] According to the City, the unrestricted use of the term "property owners" in this subsection "only makes sense if one considers all property owners as affected." Brief of the City in Support of Motion for Summary Judgment in *Schock*, No. 2016-00423, at 9.

Further, the City offered a rejoinder to Appellant's focus on the rational-basis litmus integrated into the statutory definition of "benefited property." In one passage of this argument, the City essentially resorted to a common understanding of the word "benefited." *See id.* at 10 ("[A]n 'exempt property can, and usually will, profit; therefore it can be a benefitted [sic] property."). In other segments of the argument, the City read Section 835(b)(3)'s treatment of objections by "persons representing the ownership of 40%, in numbers, of the *benefited properties* within the NID" as relevant only to the

---

[10] Again, the City's reliance on this provision is somewhat problematic, since it failed to comply with it in the Lebanon BID preliminary plan. *See supra* note 5.

initial hearing concerning a preliminary objection. Brief of the City in Support of Motion for Summary Judgment in *Schock*, No. 2016-00423, at 8 (quoting 73 P.S. §835(b)(3)) (emphasis in original). In this line of its argument, the City allowed that "benefited properties," under Section 5(b), could in fact mean "assessed properties," as follows:

> [I]t makes perfect sense that the *initial* objection process is directed to the class of property owners who are "assessed" and that they be the focus of the initial inquiry as it is found in §835[(b)(3)]. However, it also makes sense that a broader class, all property owners including those that are not assessed, be considered for the *final* legal veto as set forth in Section 835(f)(2) of [NIDA].

*Id.* at 16 (emphasis added).

For his part, Appellant did not deny that all properties may be "affected" in a generic sense. Instead, he maintained, when Section 835(f)(2) is read in conjunction with other aspects of the Act, it becomes apparent that the General Assembly intended the statutory phrase "affected property owners" to refer only to owners of assessed properties. Appellant also pointed to NID plans in other municipalities, which appear to limit objections to only assessed property owners. Additionally, Appellant referenced the Community Economic Improvement Act, 53 P.S. §§18101-18112 (the "CEIA"), governing improvement districts in the City of Philadelphia, which was amended in 2016 to define "[a]ffected property owner" as "[a] property owner with respect to whom a special assessment fee is proposed to be or has been levied as authorized by this act." *Id.* §18103. Section 5(b) of the CEIA, Appellant explained, now provides a forty-five day period after a hearing on the final plan for objections by "affected property owners," *i.e.*, those subject to assessments. *Id.* §18105(b)(5).

The common pleas court denied Appellant's motion, granted the City's motion, and dismissed the complaint. Initially, the court found that Section 5(b)(3) of the Act was "poorly drafted as it relates to the voting process," and that Section 5(f)(2) was

"[e]ven more confusing." *Schock*, No. 2016-00423, *slip op.* at 13 (C.P. Lebanon Dec. 19, 2016). Moreover, the court highlighted, under Section 5(c)(3)(vii) of NIDA, a municipality must publicize that "a negative vote of at least 40% of *the property owners within the NID proposed in the final plan shall be required to defeat the establishment of the proposed NID*," 73 P.S. §835(c)(3)(vii) (emphasis added), as contrasted with the allusion to ownership of "benefited properties" under subsection (b)(3), and "affected property owners" under subsection (f)(2).

Focusing on the meaning of "affected property owners," the court explained:

> Both parties point out that the General Assembly could have drafted the NIDA to specifically define how the 40% should be calculated. [Appellant] points out that the General Assembly could have used the word "all" if it had intended to include assessment-exempt properties, while [the City] points out that the law could have specifically used the word "assessed" if it wanted to limit voting consideration to only those who would be subject to an assessment. Needless to say, we agree with both parties that the NIDA could have been drafted in a more precise fashion.

*Schock*, No. 2016-00423, *slip op.* at 17.

The court then adopted the City's position that "affected" should be accorded its ordinary dictionary definition (*i.e.*, impacted or influenced) and expressed its view that the meaning of "affected property owners" should be assessed "as a mixed question of law and fact." *Id.* at 18. Since the affidavits submitted by the City revealed that improvements such as upgraded lighting and enhanced security would benefit all property owners within the geographic boundaries of the Lebanon BID, the court had no difficulty concluding that the owners of exempt properties were "affected property owners" for purposes of Section 5(f)(2). The court, however, did not address Appellant's specific contentions about the interrelationship between Section 5(f)(2) and associated provisions of the Act.

In conclusion, the common pleas court offered the following remarks:

> Through this litigation, we learned a great deal about BIDs. We confess that we are left with a sense of uneasiness about how BIDs are created. By establishing a process where "yes" is the default vote and "no" requires adherence to an inconvenient process, Pennsylvania has stacked the proverbial deck in favor of BIDs. In doing so, the General Assembly has declared as a matter of public policy that generating funds for urban revitalization is more important than the need to comply with the normative political process.
> . . .
>
> While we are uneasy about the BID process established in the NIDA, we must accept it as the will of the people. Moreover, our review of thousands of pages of documents has led us to respect the transparency with which the City of Lebanon has approached the establishment of the BID.

*Id.* at 23 (footnotes omitted)

The Commonwealth Court affirmed in a divided, published decision, crediting many of the City's arguments. *See Schock v. City of Lebanon*, 167 A.3d 861 (Pa.Cmwlth. 2017). In this regard, the majority initially discussed the broad discretion invested in municipalities as contemplated in the legislative findings, as well as the reference, among these findings, to neighborhood needs, goals and objectives "as determined and expressed by property owners." 73 P.S. §832(4). *See Schock*, 167 A.3d at 871 ("Unlike other Act provisions, Section 2(4) does not use the adjectives 'benefited,' 'affected,' o[r] 'assessed' in limiting the type of property owners who may participate in the decision to create an NID."). The majority also noted that the word "assessed" was absent from material provisions of the Act addressing: the property owners who must receive notice and documents, 73 P.S. §835(b)(2); the objection procedure initially associated with a preliminary plan, *id.* §835(b)(3); the mandate that a preliminary plan must afford notice that a negative vote of at least forty percent "of the

property owners within the NID" is required to defeat a final plan, *id.* §835(c)(3)(vii); the prescription for submission of a revised final plan to "property owners located within the proposed NID," *id.* §835(d); and the veto procedure associated with a final plan, *id.* §835(f)(2). The majority contrasted the Legislature's explicit use of the word "assessed" in depicting the class of property owners eligible to request termination of an NID. *Id.* §838(b); *see also Schock*, 167 A.3d at 874 (invoking the principle of statutory construction denominated *expressio unius est exclusio alterius*).

Further, the majority differed with Appellant's perspective that "affected property owners," for purposes of Section 5(f)(2), is the class of owners of "benefited properties" as defined in NIDA. *See Schock*, 167 A.3d at 872-73. In this vein, the majority opined that either or both of "affected" and "benefited" properties or property owners represented a larger subset of the group at large than "assessed" properties or property owners. *See id.*

In its discussion of "benefited properties," the majority did not offer a close review of Appellant's arguments centering upon the specific statutory definition of the integral term "rational nexus." The majority did, however, present the following policy rationale in support of its reading of the Act:

> While assessed properties must be benefited to be assessed, not all benefited properties will be assessed. Indeed, some properties may be exempt from assessment, but the owners may be encouraged nevertheless to provide in-kind services or financial contributions in lieu of a property assessment fee. *See* . . . 73 P.S. §835(c)(3)(iii). In light of this possible voluntary support from exempt but benefited properties, all benefited properties are included in this objection procedure for creating a NID.

*Id.* at 872; *see also id.* at 874 (suggesting that the General Assembly included in the objection protocol "a broader set of property owners beyond those who may be

assessed in the hope of voluntary support from owners of exempt but benefited properties").

Turning to the practices of other municipalities, the majority appeared to reason that local government units enjoy discretion to limit objections to assessed property owners should they wish. *See id.* at 874 ("[M]unicipalities are afforded the 'broadest possible discretion' in drafting their local ordinances." (quoting 73 P.S. §832(4)).[11] In relation to the CEIA's definition of "affected property owner," the majority acknowledged that it is inconsistent with its reading of NIDA but found this to be of no relevance, because "the CEIA is a different statute pertaining only to Philadelphia," and no similar definition appears in the Act. *Id.*

Senior Judge Leadbetter dissented. She reasoned that all properties within any NID will be impacted in some way, as exemplified by the present record. Accordingly, in her view, the Legislature must have intended to signify a subset of NID property owners by qualifying them as "affected" property owners. Ultimately, she concluded that the statutory phrase "affected property owners" should be understood to mean "assessed property owners." *See id.* at 875 (Leadbetter, S.J., dissenting) ("I believe that interpreting 'affected' to mean 'assessed,' is closer to the statutory intent than interpreting 'affected' to mean 'all.'").

Appeal was allowed on Appellant's petition to address the issue, as most simply framed by Senior Judge Leadbetter, of whether the term "affected property owners" in Section 5(f)(2) refers to *all* property owners within the geographic boundaries of an NID

---

[11] The Commonwealth Court majority cited no authority for the untenable proposition that persons or entities subject to regulation under a statutory scheme may interpret the terms of the governing provisions differently and according to their own purposes in materially identical circumstances.

or only to *assessed* property owners. We view this issue as one of statutory construction, as to which our review is plenary. *See Oliver v. City of Pittsburgh,* 608 Pa. 386, 393, 11 A.3d 960, 964 (2011).[12]

## II. Analysis

### A. Ambiguity

Appellant opens his argument with the assertions that NIDA is materially ambiguous and that the meaning of the statute's relevant terms must be determined by their context. *See, e.g.*, Brief for Appellant at 16-17. The City, on the other hand, advises that the relevant terms are clear and free from ambiguity. *See* Brief for Appellee at 12. According to the City, "[r]uminating over statutory language in a seemingly boundless effort to ascertain the intent of the General Assembly -- in this case -- presents a genuine opportunity to endeavor on a fruitless journey." *Id.* at 17.

However, the City's failure to maintain a clear and consistent position in its submissions to property owners and to the courts belies its present claim that NIDA is clear and unambiguous in all material respects.[13] Furthermore, in terms of Judge Leadbetter's framing of the issue, we find the enactment to be ambiguous, *inter alia*, because it otherwise employs both of the words "all," *see, e.g.*, 73 P.S. §835(b)(1), and "assessed," *see, e.g.*, *id.* §838(b), but those words are absent from the relevant context,

---

[12] The county court's position that the issue is a mixed one of law and fact is addressed infra at note 17.

[13] For example, and as already noted, at a time when the City was attempting to isolate Section 5(b)(3)'s objection procedure from Section 5(f)(2)'s veto process, the City allowed that "benefited" under Section 5(b)(3) could mean "assessed." *See* Brief of the City in Support of Motion for Summary Judgment in *Schock*, No. 2016-00423, at 8 (quoting 73 P.S. §835(b)(3)). Presently, however, the City asserts that the term "benefited' in Section 5(b)(3) most clearly *does not* mean only assessed. *See, e.g.*, Brief for Appellee at 32, 34.

*see id.* §§835(f)(2). Ordinarily, then, we would presume that "affected" has a meaning independent of either word. *See PECO Energy Co. v. Com.*, 591 Pa. 405, 411, 919 A.2d 188, 191 (2007) ("[T]he Legislature is presumed to understand that different terms mean different things."). We are presented by the parties, however, with an either-or choice, and we agree that the *all*-or-*assessed* alternatives are the only reasonable ones in the circumstances.

In the broader frame, NIDA variously employs the terms "affected," "designated," "all designated," "benefited," "benefiting," "designated benefited," "the several," "all," and "assessed" to refer to all or certain properties and/or property owners within the geographic boundaries of an NID. On occasion, the term "property owners" appears in an unmodified form. *See, e.g.*, 73 P.S. §833 (defining "Special assessment fee" as '[t]he fee assessed on property owners within" an NID).[14] As more fully discussed below, from context, it is readily discernable that each of these terms cannot carry a distinct meaning. Since, as more fully discussed below, there are strong competing policy rationales favoring, and disfavoring, voting on the establishment of an NID by exempt property owners -- particularly under the procedures specified in NIDA in which property owners who do not vote are counted as "yes" votes -- we have little alternative than to assess the Act's material terms according to context. In this regard, to the extent that the City means to depict such review as a fruitless endeavor, this portrayal is

---

[14] Whereas in other contexts, the City contends the "property owners" means all property owners within the geographic boundaries of an NID, *see, e.g.*, Brief for Appellee at 27 (discussing 73 P.S. §835(c)(3)(vii)), it would be untenable to interpret the above reference from the Section 3 definition of "Special assessment fee" to "property owners within" an NID as including those whose properties are exempt. The only sensible understanding of this provision is that it concerns, without saying, only "certain" property owners, *i.e.*, those who are assessed fees. This example, again, highlights the importance of context in statutory construction.

not well-taken. *Accord Giant Eagle, Inc. v. W.C.A.B. (Givner),* 614 Pa. 606, 612, 39 A.3d 287, 290 (2012) ("In giving effect to the words of the legislature, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." (citation omitted)).

Moreover, there are core incongruities within the statutory scheme that impede a cohesive understanding. For example, as noted, the very definition of a BID requires that it be "comprised of real property which is used for any for-profit activity involving trade and traffic, or commerce in general." 73 P.S. §833 (definition of "Business improvement district"). It is only via a reference to the definition of NIDs that one can appreciate that BIDs are a type of NID, and accordingly, that the geographic boundaries of NIDs may encompass property that is not used for commercial purposes. *See id.* (definition of "Neighborhood improvement district").

Appellant's specific, context-based argument depends on the following core propositions: "affected property owners," for purposes of Section 5(f)(2)'s veto procedure, are the owners of benefited properties identified in Section 5(b)(3); "benefited properties" has a specific statutory definition turning on rational nexus; and rational nexus is also a defined term which concerns itself only with assessed property owners. Accordingly, Appellant contends, owners of "benefited properties" are persons who own non-exempt properties and therefore will bear the financial burden of the monetary assessments upon the establishment of an NID.

## B. Affected Property Owners and Benefited Properties

For purposes of this case, at least, it would seem to be relatively straightforward that "affected property owners" must mean the owners of "benefited properties," because that is what the City told property owners and lessees in a depiction of the objection procedure. *See* Letter of Cindy Heisey, Lebanon BID Steering Committee

Chair, dated November 20, 2015, at 1 (depicting Section 5(f)(2)'s procedure for veto of a final plan -- which concerns objections of "affected property owners" -- as follows: "In accordance with [NIDA], objections from at least 40% of *the benefited property owners* within the district boundaries are required to defeat the establishment of the BID." (emphasis added)).  Nevertheless, in various court submissions and in its present brief, the City has suggested that "affected," under Section 5(f)(2), is broader than "benefited" under Section 5(b)(3).  *See, e.g.*, Brief for Appellee at 40 ("The question is not whether the properties will *benefit*; rather, the question is how will the property be *affected* by the NID?" (emphasis added)).  We disagree.

As Appellant has explained, Section 5(f)(1) prescribes that objections to and disapproval of a final plan are administered "under the requirements of subsection (b)(3)."  73 P.S. §835(f)(1).  Section 5(b)(3) indicates that "[a]ny objections by property owners within the proposed NID must be made in writing by persons representing the ownership of 40%, in numbers, of the *benefited properties* within the NID."  *Id.* §835(b)(3) (emphasis added).  While Section 5(f)(2) addresses "40% or more of the affected property owners," *id.* §835(f)(2), Section 5(b)(3)'s admonition that "any objections" must be asserted by persons representing the ownership of benefited properties -- as well as Section (f)(1)'s concomitant express incorporation of the procedure from Section 5(b)(3) into the veto procedure for final plans specified in Section (f)(2) -- support the conclusion that the "affected property owners" are persons who own the benefited properties.[15]

---

[15] In its brief, the City has abandoned its previous position that Section 5(b)(3)'s objection procedure relates to preliminary plans only, presumably in light of the broader phrasing of the statute and on account of Section 5(f)(1)'s express cross-reference to Section 5(b)(3).

Although the language certainly could be made much clearer, the City effectively concedes that "affected" property owners and owners of "benefited properties" are the same, so long as an owner does not mount a challenge and establish a lack of benefit. *See, e.g.*, Brief for Appellee at 35-36 (discussing a purported presumption that all properties within the geographic boundaries are "benefited" and thus "affected.").[16] In other words, in the City's view, a property may be detrimentally *affected* and thus not *benefited.* This line of analysis is not relevant, however, where, as here, no such discrete challenges to the NID's impact upon individual properties has been lodged.[17]

Based on the above, we conclude that term "affected property owners," as employed in Section 5(f)(2), does not necessarily carry the broadest meaning encompassing any and all impacts or effects, but rather, must in the first instance be read in light of the legislatively-prescribed definition of "benefited property."

---

[16] The City's view of the relevant presumption is in contention, for purposes of NIDA at least, since Appellant posits that the enactment's definition of "benefited" and the associated concept of rational nexus are concerned only with *assessed* properties. *See, e.g.*, Brief for Appellant at 24-27.

[17] It is on account of the lack of any such challenge that we differ with the county court's position that the legal issue in this case is one of law and fact. *See Schock*, No. 2016-00423, *slip op.* at 18. Special assessments for local improvements "are made on the *assumption* that a portion of the community will benefit specially, through enhancement of the value of property peculiarly situated in regard to the contemplated expenditure of public funds." 89 AM. JUR. PROOF OF FACTS 3d 421 (2006) (emphasis added).

It seems to be relatively clear that the Legislature applied just this notion of presumed benefit -- *i.e.*, the idea that the burden of fees is offset by the benefits deriving from improvements and services -- in devising NIDA. Additionally, as long as the presumption remains intact, there is no need for any factual assessment. Accordingly, and, as we have said, the issue here is purely a matter of statutory construction of the material terms of NIDA, over which this Court's review is plenary.

## C. Benefited Properties and Rational Nexus

We also agree with Appellant that "benefited properties" are the assessed properties that are presumptively benefited. As Appellant has explained, the statutory rational-nexus test integrated into the definition of "benefited property" concerns itself only with assessed properties. *See* 73 P.S. §833 (defining rational nexus in terms of benefit accruing to "any property owner assessed a fee" and specifying that all property owners paying a special assessment must benefit).

Despite this definitional focus, the City contends that rational nexus (and, accordingly, the associated term "benefited property") also concern exempt properties and property owners. In this regard, it is the City's position that all property owners within the geographic boundaries of an NID are disadvantaged to a degree, since all properties are impacted by an assessment ordinance. The City explains,

> The critical factor in this case is the all-encompassing nature of the assessment ordinance established by a NID. The assessment ordinance attaches to every property within a proposed NID. Every property within a proposed NID will, therefore, become subject to a binding assessment ordinance, assuming it is legally and properly adopted.

Brief for Appellee at 9. Additionally, the City relies on *S.O.L. Club, Inc. v. City of Williamsport*, 65 Pa. Cmwlth. 351, 443 A.2d 410 (1982), as recognizing that the presumption of benefit extends to any "property which is the subject of a legal and properly adopted assessment ordinance," *id.* at 353, 443 A.2d at 411, including properties that are presently exempt.

Although the phraseology approved in *S.O.L. Club* would facially appear to encompass exempt properties, the litigation in that case involved a property owner's challenge to an exaction. *See id.* Accordingly, the decision offers no developed

rationale to support extending non-statutory,[18] rational-nexus review to exempt properties, and it remains an issue of first impression, under principles of constitutional or common law, whether the review should apply to potential assessments that depend on future events. *See generally Oliver*, 608 Pa. at 395, 11 A.3d at 966 (explaining that the holding of a judicial decision is read against its facts) (citing *Commonwealth v. McCann*, 503 Pa. 190, 195, 469 A.2d 126, 128 (1983))). In NIDA, however, the Legislature has provided a specific statutory definition of rational nexus which, by its terms, concerns only assessed property owners. *See* 73 P.S. §833.

The understanding that "rational nexus," and concomitantly, "benefited property" concern assessed properties is further supported by Section 7(b)(5) and (d) of the Act. Section 7(b)(5), captioned "[a]ssessments," authorizes various alternative methods for calculating assessments to address the total costs of improvements, programs, and administrative services provided by a NIDMA, each of which contemplates only "benefited," "designated benefited," or "benefiting" properties. 73 P.S. §837(b)(5).[19] Section 7(d) employs the same use of "benefited properties," providing for liens upon them to secure the payment of fees. *See id.* §837(d).[20] Accordingly, several references to benefited properties within the Act clearly connote only assessed properties.

---

[18] *S.O.L. Club* concerned a business improvement district under the Business Improvement District Act of 1967, 53 P.S. §§1551-1554 (repealed), which did not provide a definition for rational nexus.

[19] It would obviously ease the interpretive task if the Legislature would refrain from employing multiple variations on defined terms.

[20] The provision clarifies that only fees that are past due, or which become payable in any given year, are in issue, *see id.* §837(d)(1)(i), (ii), and it obviously has no application so long as a particular property remains exempt.

In summary, core contextual considerations clarify that the "benefited properties," under NIDA, are the assessed properties.

## D. Other Contextual Considerations

Consistent with the concerns of the Commonwealth Court majority, the City places substantial emphasis on the incongruity in notifying "all property owners" of the effort to create an NID, *see* 73 P.S. §835(b)(1), and specifying that "the property owners within the NID proposed" may vote, *id.* §835(c)(3)(vii), but then permitting only assessed property owners to do so. Along these lines, the City also reiterates that hearings are conducted to entertain public comment "by affected property owners," *id.* §835(e), and highlights the disharmony in excluding from a public hearing those who may be impacted by an NID in ways different than being burdened by monetary assessments. *See* Brief for Appellee at 26 ("It would defy rational thought to glean from this provision . . . that the legislature intended to limit public comment to only owners of assessed properties.").

All of these concerns bear some validity. The terms of NIDA themselves, however, provide for the broad notice and invitation to vote, but then only narrow the class of persons actually eligible to offer cognizable objections within the procedures regulating the counting of objections. *See* 73 P.S. §835(b)(3) ("Any objections by *property owners* within the proposed NID must be made . . . by persons representing the ownership of 40%, in numbers, of *the benefitted properties* within the NID." (emphasis added)).

Certainly, municipalities may make modest allowances to ameliorate NIDA's idiosyncrasies. For example, nothing in the enactment prevents municipalities from making clear in their submissions to property owners what the statute prescribes by a circuitous route, *i.e.*, that only those burdened by the fees may cast effective votes. And

nothing prevents municipalities, at hearings, from entertaining comments from a broader array of property owners than the "affected" ones. 73 P.S. §835(b)(2). However, the alternative to recognizing that Section 5(b)(3) narrows the class of persons eligible to lodge effective objections would be to treat that provision's explicit equation of "property owners" authorized to object with owners of "benefited properties" as surplusage, which would contravene a core principle of statutory construction. *See* 1 Pa.C.S. §1921(a).[21]

In terms of the likelihood to generate confusion among property owners, we reiterate that the City's own submissions to the owners within the Lebanon BID, under its own approach to an understanding of NIDA, created a substantial risk of misperception in their own right. *See supra*. Consistent with the present clarification, municipalities can more clearly convey to property owners and lessees that the class of property owners eligible to vote is statutorily limited to owners of "benefited," *i.e.*, assessed, properties. *See* 73 P.S. §835(b)(3).[22]

---

[21] We realize, given the awkward and convoluted layout of NIDA, that we must select among competing principles of statutory construction to achieve the necessary clarification. Here, we choose to prioritize the axiom that all provisions should be accorded meaning.

In the broadest frame, it appears that the General Assembly, in its various prescriptions within the Act, failed to consistently account for the presence of exempt properties. For example, the statutory definition of "Business Improvement District" is "a limited geographical area comprised of real property which is used for any for-profit activity involving trade and traffic, or commerce in general." 73 P.S. §833. Literal adherence to these terms would be unreasonable, given that non-profit and residential uses are typically interspersed within commercially-oriented locales throughout the Commonwealth. Accordingly, one must take for granted that the Legislature's focus was on explicating the commercial dynamic of a geographically diverse district.

[22] We also take little guidance from the Commonwealth Court majority's opinion that the Legislature included all property owners in the objection procedure in light of the speculative possibility of voluntary support from those who have been exempted from assessments. *See Schock*, 167 A.3d at 872, 874.

### E. Other Principles of Statutory Construction

To this point, we have determined that contextual and definitional cues in NIDA support the conclusion that "affected property owners," for purposes of the final-plan-veto procedure of Section 5(f)(2), are the owners of "benefited properties" referenced in Section 5(b)(3), and that "benefited property" means assessed property. We now turn to other principles of statutory construction to evaluate whether there are other considerations which might override that understanding.

The City stresses the indication, in the legislative findings included in NIDA, that municipalities should be afforded the broadest discretion in establishing improvement-district programs consistent with local needs, goals, and objectives "as determined and expressed by property owners in the designated district." 73 P.S. §832(4). According to the City, limiting veto power to assessed property owners would frustrate these salutary aims. Additionally, the City highlights the principle of statutory construction evincing that the Legislature favors public interests over private ones. *See* 1 Pa.C.S. §1922(5).

In terms of the consequences of an interpretation depriving exempt property owners of the ability to vote, *see* 1 Pa.C.S. §1921(c)(6), the City posits that such exclusion would result in their systematic alienation. The City explains that exempt property owners may be concerned about "increased traffic and activity, parking problems, ongoing construction, or commotion from early-morning and late-night comings and goings of business people and bar-and-restaurant patrons," as well as potential increases in property taxes and diminution of the pool of buyers for their properties. Brief for Appellee at 14 ("To claim that only those who pay the fee are affected by a NID is to turn a blind eye toward the inevitable change -- good or bad --

that every property owner will face."); *id.* at 40 ("For every benefit, there exists a real possibility for a resulting burden.").

Further, the City envisions a series of perverse results. For example, the City foresees potential manipulation of the scope of voting classes by NIDMAs, perhaps via imposing nominal fees on residential properties to broaden the class of property owners holding veto power. According to the City, exempt property owners resisting their inclusion in an NID would be deprived of any remedy, since they would not be able to contest their designation as a "benefited property." Finally, the City contends that Appellant's interpretation unfairly precludes those who might intend to change the use of their exempt property to a commercial one in the near future from participation in the voting process; frustrates the provisions for amending final plans; and invites abuses of the amendment process. In these respects, the City regards the result of an interpretation limiting votes to assessed property owners as "absurd, impossible of execution or unreasonable." 1 Pa.C.S. §1922(1).

Of course, in the broadest frame at least, the example of the CEIA demonstrates that excluding exempt property owners from voting on the establishment of a neighborhood improvement district is not absurd, unreasonable, or incapable of execution, since that is precisely what the General Assembly has provided in the City of Philadelphia. *See* 53 P.S. §18103 (defining "affected property owner" as "[a] property owner with respect to whom a special assessment fee is proposed to be or has been levied as authorized by this act"); *id.* §18105(b)(7) (providing for voting on the establishment of a neighborhood improvement district only by "affected property owners"). Despite CEIA's explicit conferral of voting power solely upon assessed property owners, the enactment contains a legislative finding identical to the one from NIDA upon which the City relies: "Municipalities should be given the broadest possible

discretion in establishing by local ordinance the type of assessment-based programs most consistent with neighborhood needs, goals and objectives as determined and expressed by property owners in the designated district." *Id.* §18102(4). Additionally, under CEIA, the initial hearing is also for the purpose of receiving comment from assessed property owners, *see id.* §18105(b)(2), albeit that nothing in the statute, or in NIDA for that matter and as we have said, forecloses the municipality from entertaining input from other interested persons.

Consistent with the reservations expressed by the common pleas court, there are substantial, competing policy considerations in the design of a voting scheme pertaining to the establishment of NIDs. On the one hand, assessed property owners would appear to have the most at stake, since they must bear the entire financial burden. On the other hand, the owners of exempt properties are impacted. Thus, there is potential unfairness either in permitting those who may have the least at stake to vote or in excluding them. Moreover, a voting regime that would count the silence of those who are the least likely to be materially interested as "yes" votes would compound the potential unfairness. And it would seem as if there may be perverse incentives in either system, both of which lack an evenhanded methodology for weighting votes.

Thus, while the City raises some valid policy concerns, we find its arguments in this line to be insufficient to overcome the contextual analysis above, turning on the statutory definition of rational nexus, and bolstered by the appearance of multiple references to benefited properties and property owners in other of NIDA's provisions that clearly depict only *assessed* properties and property owners. Subject to constitutional limitations, it was the General Assembly's prerogative to design the

scheme for voting on the establishment of NIDs.[23] In terms of the City's hypotheses about strategic behavior on the part of municipalities, there would seem to be as many speculative, perverse incentives and results attending both of the competing, imperfect schemes envisioned by the litigants as one may take the time to imagine. Clearly, the statutory scheme merits revisiting and adjustment by the policy-making branch in light of ongoing review and experience.

Ultimately, although we find the shifting terminology within the Act to be awkward and ambiguous, we conclude that the statute's veto provisions pertaining to final NID plans concern only assessed property owners.

The order of the Commonwealth Court is reversed, and the matter is remanded for entry of a declaratory judgment consistent with this opinion.

Justices Baer, Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.

Justice Wecht files a concurring opinion.

---

[23] The parties cite no decision of any court indicating that any particular voting procedure, or any voting process at all for that matter, is constitutionally required in connection with the formation of an NID.